## TEXAS BENEVOLENT ASS'N v. LEE et al.
### No. 8308.

Court of Civil Appeals of Texas. Austin.

June 24, 1936.

Callaway & Callaway, of Brownwood, for appellant.

Wilkinson & Wilkinson, of Brownwood, and G. A. Walters, of San Saba, for appellees.

BLAIR, Justice.

Appellees, R. L. Lee and wife, Sarah A. Lee, sued appellant, the Texas Benevolent Association, on its certificate of insurance covering the life of appellees' daughter, Bessie Lee, deceased, in the sum of $1,000. As defense appellant plead the provision of the certificate that "if the insured shall not be in good health at the time this certificate is delivered * * * then said certificate shall be null and void," alleging that the certificate was issued without medical examination, and that the insured was not in good health at the time it was delivered to her on September 20, 1933, but that the insured was a confirmed and incurable invalid, suffering with paralysis, osteomyelitis, and decaying of her bone structure, from which she had been afflicted for more than 10 years, if not during her entire lifetime.

The insurance certificate in suit was issued under the following facts:

Bessie Lee, together with her parents, was first insured in the San Saba Home Mutual Life Insurance Association several years preceding her death. This association became insolvent, and Bessie Lee was transferred without cost to the Citizens Mutual Life & Accident Association, of Brownwood, Tex. This concern was taken over by the Central Benevolent Association of San Angelo, Tex., and by a rider it assumed the liability on the policy issued to Bessie Lee by the said Citizens Mutual. The Central Benevolent then changed its domicile to Brownwood, Tex., and then apparently qualified under chapter 245, p. 856, Acts 1933, as The Texas Benevolent Association of Brownwood, Tex., and mailed Bessie Lee a "new policy," in lieu of the one assumed by the Central Benevolent Association, which new policy contained the above-quoted provision with regard to good health, no medical examination being required. This certificate was dated September 20, 1933, and was accepted by Bessie Lee, October 27, 1933.

In submitting the one issue to the jury, the court instructed them, in substance, that the term, "good health," as used in the certificate and special issue, meant a state of health free from disease or ailment that affected the general soundness or healthfulness of the system, as distinguished from mere temporary indisposition which did not tend to weaken or undermine the constitution of the insured, and not afflicted with disease or bodily infirmity of a substantial nature which affected her general health, or which materially increased the risk assumed by the insurer. The jury found that

Bessie Lee was in good health at the time the certificate was delivered to her, and judgment was accordingly rendered for appellees.

Appellant contends that the evidence showed as a matter of law that Bessie Lee, the insured, was not in good health at the time the certificate was delivered to her. We do not sustain the contention.

The evidence concerning the health of the insured was not confined to the date of the delivery of the certificate, but due to the peculiar facts relating to her physical condition, the inquiry covered practically her entire lifetime. At the age of about six years and while playing, the insured fell on the floor and injured her knees, which resulted in paralysis or loss of use of her limbs below the knees for the remainder of her lifetime, rendering her unable to walk, except by pulling up to a chair or other objects. From this injury she suffered intermittent pain during her lifetime, and intermittently her knees would become swollen and would burst and discharge pus. In 1927, some 20 years or more after her injury, an operation was performed on one of her knees, and small slivers of bone were removed. After this operation, her knees healed for some three years and then broke and discharged pus for a short time; and according to the testimony of both her father and mother her knees were better after the operation, although they did discharge some pus intermittently. Other than this infirmity, both parents testified that the insured's general health was good during her entire lifetime and up until four days of her death, on May 29, 1934, when she died at the age of about 30 years, after a 4-day illness from a "perforated appendix and peritonitis." The insured had a light case of measles in the spring of 1933, and this was the only time she ever had a doctor to attend her for illness during her entire lifetime until her last sickness and death. Based upon the fact that her appetite was good, that she slept well, and, except for intermittent pain from her knees, insured's parents testified that her general health was always good.

Although the insured's legs never developed, she weighed from 77 to 80 pounds, which compared favorably, considering her crippled condition, with her mother, who never weighed more than 92 pounds, and her two sisters, who never weighed more than a 100 pounds.

A neighbor of the Lee family testified that he was acquainted with the insured and for 14 years next preceding her death had visited in the Lee home often, and had never heard deceased complain of being ill, except she had the measles a few months before her last illness and death.

Dr. F. W. Farley, who made a slight examination of the insured's knees several years before her death and was one of the attending physicians during her last sickness, testified, by deposition, that he did not know about the general health of the insured, and, as follows:

"Q. Do you know what disease caused the death of the deceased, Miss Bessie Lee; if so, what was the cause? A. The cause of Miss Bessie Lee's death was a perforated appendix and peritonitis."

"Q. Within your knowledge as a practicing physician, could her crippled condition have contributed in any way or manner to the disease of which she died? Answer fully. A. Her crippled condition could not have caused her appendicitis, but might have been responsible for lowering her resistance to such an extent that she was less able to overcome the disease."

Dr. W. A. Whittenburg, who attended the insured when she had the measles about seven or eight months before her death and also attended her during her last illness, testified, as follows:

"Seven or eight months before Bessie Lee died her health was just about as good as I ever knew it—as far as I know of it, as far as I knew of the girl, and from what I knew about her she was in good general health."

"Q. Can you tell the jury whether her crippled condition had anything to do with her last illness or death? A. I can't see that it did—I don't think it had anything to do with it; I think this was a separate thing altogether."

Dr. Whittenburg further testified that he had known the insured about 20 years; saw her on the streets of the town of Lometa frequently; and that from his observation of her, and the fact that she ate and slept well and digested her food well, he would say that she was "in good general health, even though she could not walk and might be pronounced a chronic invalid on that account."

The above evidence which in the main was undisputed fully sustains the finding of the jury that the insured was in good

health, as that term was defined to them by the court at the time the certificate was delivered to her.

The judgment of the trial court will be affirmed.

Affirmed.